1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| MARK HOWELL, individually and on behalf of all others similarly situated, | CASE NO. 15cv1337-GPC(NLS) |
|---|---|
| Plaintiff, | **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND** |
| vs. | [Dkt. No. 19.] |
| GRINDR, LLC, | |
| Defendant. | |

Before the Court is Defendant Grindr, LLC's motion to dimiss pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1), 12(b)(6), and alternatively, 12(f). (Dkt. No. 19.) Plaintiff filed an opposition. (Dkt. No. 22.) Defendant filed a reply. (Dkt. No. 24.) Pursuant to the Court's order, Plaintiff filed a supplemental brief on November 24, 2015, and Defendant filed a supplemental brief on December 2, 2015. Pursuant to Civil Local Rule 7.1(d)(1), the Court finds the matter suitable for adjudication without oral argument. After a review of the complaint, the briefs and the applicable legal standard, the Court GRANTS Defendant's motion to dismiss.

## Background

Plaintiff Mark Howell ("Plaintiff") filed the operative amended complaint ("FAC") alleging a putative class action against Defendant Grindr, LLC ("Defendant") for violations of California's Dating Service Contracts Act ("DSCA"), Cal. Civ. Code

sections 1694 *et seq.*; California Unfair Competition Law, Cal. Bus. & Prof. Code sections 17200 *et seq.* and California Business & Professions Code sections 17535 *et seq.* (Dkt. No. 15, FAC.)

    Starting in 2009, Defendant launched Grindr, the largest and most popular all-male location based social network application for smartphones. (Id. ¶ 12.) Plaintiff alleges that according to Defendant's website, http://grindr.com/learn-more, more than five million guys in 192 countries use Grindr. (Id.) Beginning in 2013, Plaintiff paid $11.99 per month to join Grindr Xtra, Defendant's premium service. (Id. ¶ 16.) When joining Grindr Xtra, consumers are required to enter their names, telephone numbers, addresses and statistics into Defendant's system. (Id. ¶ 17.) In addition, consumers will also upload photographs and/or videos onto Defendant's system. (Id.) At the time Plaintiff joined Defendant's online dating service,[1] Defendant's contract with California consumers failed to include a three day cancellation provision as required by California Civil Code section 1694.2(b). (Id. ¶¶ 18, 19.) In addition, Defendant's contract also failed to include the name and address of the dating service operator to which the notice of cancellation was to be mailed in violation of California Civil Code section 1694.2(c). (Id. ¶ 20.) If a dating service contract is not in compliance with California Civil Code section 1694 *et seq.*, the buyer may, at any time, cancel the contract. Cal. Civ. Code § 1694.2(e). (Id. ¶ 21.)

    At the time Plaintiff joined Grindr Xtra, Defendant failed to provide Plaintiff with a notice of Plaintiff's right to cancel which is in violation of California Civil Code sections 1694 *et seq.* (Id. ¶ 22.) Defendant's contract explicitly states that Plaintiff's subscription with Defendant would remain active until the end of Plaintiff's subscription period following Plaintiff's cancellation of said dating service contract.

---

[1] According to Defendant, Grindr is a smartphone application geared toward gay and bisexual men and not an online dating website. (Dkt. No. 19-1, D's Mot. at 12.) To use the application, a user downloads and installs it on a smartphone. Once it is downloaded, he can use the phone to find people nearby who are available to meet without any cost. (Id.) Users seeking additional features can download a premium app called Grindr Xtra. (Id.) Grindr Xtra is a fee-based subscription. (Id.) Plaintiff does not dispute that Grindr is a smartphone application.

(Id. ¶ 23.) Upon cancellation of Plaintiff's contract with Defendant, Plaintiff was required to pay Plaintiff's subscription fee for that entire month despite the fact that a noncompliant dating service contract may be cancelled at any time. (Id. ¶ 24.) As a result of Defendant's violations, its contract for dating services are "void and unenforceable." Cal. Civ. Code § 1694.4(a).

Defendant moves to dismiss pursuant to 12(b)(6) based on Plaintiff's lack of statutory standing and that Grindr Xtra is not covered by the SDCA. Defendant also moves to dismiss pursuant Rule 12(b)(1) for lack of Article III standing. Lastly, Defendant moves, alternatively, to strike the class action allegations pursuant to Rule 12(f) in the event the Court does not dismiss the FAC.

## Discussion

**A.    Legal Standard on Federal Rule of Civil Procedure 12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory. See Balistreri v. Pacifica Police Dep't., 901 F.2d 696, 699 (9th Cir. 1990). Under Rule 8(a)(2), the plaintiff is required only to set forth a "short and plain statement of the claim showing that the pleader is entitled to relief," and "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).

A complaint may survive a motion to dismiss only if, taking all well-pleaded factual allegations as true, it contains enough facts to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. "In sum, for

a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." Moss v. U.S. Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009) (quotations omitted). In reviewing a Rule 12(b)(6) motion, the Court accepts as true all facts alleged in the complaint, and draws all reasonable inferences in favor of the plaintiff. al-Kidd v. Ashcroft, 580 F.3d 949, 956 (9th Cir. 2009). The court evaluates lack of statutory standing under the Rule 12(b)(6) standard. Maya v. Centex Corp., 658 F.3d 1060, 1067 (9th Cir. 2011).

Where a motion to dismiss is granted, "leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" DeSoto v. Yellow Freight Sys., Inc., 957 F.2d 655, 658 (9th Cir. 1992) (quoting Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986)). In other words, where leave to amend would be futile, the Court may deny leave to amend. See Desoto, 957 F.2d at 658.

**B.     Legal Standard on Federal Rule of Civil Procedure 12(b)(1)**

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of a complaint for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The Article III case or controversy requirement limits a federal court's subject-matter jurisdiction by requiring . . . that plaintiffs have standing and that claims be 'ripe' for adjudication." Chandler v. State Farm Mut. Auto. Ins. Co., 598 F.3d 1115, 1121 (9th Cir. 2010). Rule 12(b)(1) jurisdictional attacks can be either facial or factual. White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000). It appears that Defendant is raising a facial attack on the FAC alleging lack of Article III standing. See Maya , 658 F.3d at 1067 (lack of Article III standing requires dismissal for lack of subject matter jurisdiction under Rule 12(b)(1)).

**C.     Statutory Standing**

First, Defendant moves to dismiss pursuant to Rule 12(b)(6) arguing that

1  Plaintiff lacks statutory standing to file suit under the DSCA because he has not alleged
2  an injury caused by the violation.  Plaintiff argues he has adequately pled that he was
3  injured due to Defendant's violation of the DSCA.

4      Non-constitutional standing exists when "a particular plaintiff has been granted
5  a right to sue by the specific statute under which he or she brings suit." Cetacean
6  Comm. v. Bush, 386 F.3d 1169, 1175 (9th Cir. 2004) (quoting City of Sausalito v.
7  O'Neill, 386 F.3d 1186 1199 (9th Cir. 2004) ("this is a purely statutory inquiry")); see
8  also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 883 (1990) (in order to demonstrate
9  statutory standing, plaintiff must "establish that the injury he complains of falls within
10 the 'zone of interests' sought to be protected by the statutory provision whose violation
11 forms the legal basis for his complaint.").  A plaintiff's standing to sue is a threshold
12 issue to be decided before the merits can be reached. Boorstein v. CBS Interactive,
13 Inc., 222 Cal. App. 4th 456, 465 (2013).  If a plaintiff fails to allege a cognizable injury
14 resulting from a violation of a statute, the plaintiff lack "statutory standing" to bring
15 a claim.  Id. at 467.

16     There are no cases addressing statutory standing as to the DSCA.  However,
17 cases interpreting California's "Shine the Light" ("STL") law provides some guidance
18 as it contains a similar remedy provision.  The STL was enacted to "shine the light" on
19 information-sharing practices by requiring businesses with more than 20 employees to
20 establish a procedure by which a consumer can obtain information concerning these
21 practices.  See Cal. Civ. Code § 1798.83(a).  The STL states that "[a]ny customer
22 injured by a violation of this title may institute a civil action to recover damages." Cal.
23 Civ. Code § 1798.84(b).  The "STL law does not allow a cause of action based solely
24 upon a failure to comply with the statute.  Rather . . . [it] requires an injury resulting
25 from a violation." Boorstein, 222 Cal. App. 4th at 467 (citation omitted).

26     In Miller, the plaintiff alleged that Defendant violated the STL law by failing to
27 properly designate and publicize on its website a location to send STL inquires as
28 required by the statute.  Miller v. Hearst Comms., Inc., No. CV 12-733 GHK(PLAx),

2012 WL 3205241 (C.D. Cal. Aug. 3, 2012). However, the plaintiff did not allege that she ever made a request for information or that she would have done so had the proper contact information been available. Id. at 5. The court concluded that the STL claim which requires an "injury" in conjunction with a violation, failed for lack of statutory standing. The court noted there is a cognizable informational injury when a plaintiff has requested information and is subsequently denied. Id. at 6. Since the plaintiff did not allege she requested information and was denied, or that she would have requested the information had she been provided with the proper contact information, the court concluded there was no informational injury. Id.; see also Boorstein v. Men's Journal, LLC, No. CV 12-771 DSF(Ex), 2012 WL 2152815, at *3 (C.D. Cal. June 14, 2012) (because the violation alleged was not the cause of the purported economic injury, there was no statutory standing to sue).

Section 1694 requires that a dating service contract must contain a three day right to cancel, and the name and address of the dating service operator to which the notice of cancellation is to be mailed. Cal. Civ. Code §§ 1694.2(b), (c). Any dating service contract that does not comply with section 1694 *et seq*. is "void and unenforceable." Id. § 1694.4. If a dating service contract is not in compliance with section 1694 *et seq*., the buyer may, at any time, cancel the contract. Cal. Civ. Code § 1694.2(e). "Cancellation occurs when the buyer gives written notice of cancellation . . . to the seller at the address specified in the agreement or offer." Id. § 1694.2(b). Then all "moneys paid pursuant to any contract for dating services shall be refunded within 10 days of receipt of the notice of cancellation." Id. § 1694.2(e). "Any buyer injured by a violation of this chapter may bring an action for the recovery of damages in a court of competent jurisdiction." Id. § 1694.4(c).

In this case, the amended complaint alleges that Defendant's dating service contract does not include a three day cancellation provision, and does not include the name and address to which the notice of cancellation is to be mailed. (Dkt. No. 15, FAC ¶¶ 19, 20.) Then, "[u]pon cancellation," Defendant did not return the pro rata

portion of the subscription fee for the month of cancellation. (Id. ¶ 24.) Plaintiff alleges that Defendant's failure to return the pro rata portion of funds not used for the month monetarily injures the consumers. (Id. ¶¶ 23-24.)

The FAC separately alleges a violation of the statute and monetary injury, but does not allege that the injury resulted from a violation of the statute. The FAC does not allege the facts surrounding the cancellation of the contract. The words "[u]pon cancellation", does not properly explain how the contract was cancelled, and/or whether Plaintiff attempted to cancel the contract as outlined in section 1694. Without more facts, Plaintiff has not sufficiently alleged statutory standing, which requires a showing that the economic injury suffered by him was due to a violation of the statute. A violation of the statute itself is not enough. See Boorstein, 222 Cal. App. 4th at 467. Thus, Plaintiff lacks statutory standing by failing to allege a cognizable injury, and the Court GRANTS Defendant's motion to dismiss the first cause of action under the DSCA.

**D.     Applicability of DSCA**

In addition, Defendant moves to dismiss the DSCA claim arguing that Grindr is not subject to the DSCA. It asserts that the DSCA, which was enacted in 1989, did not contemplate smartphone applications[2] but concerned in-person sales of dating service contracts. It also maintains that the statute was enacted due to high pressure in-person sales of high priced dating service centers, which is not applicable to a smartphone application. In its supplemental brief, Plaintiff argues that the application of the DSCA to smartphones furthers the purposes for which the DSCA was enacted which is to protect consumers "against fraud, deceit and financial hardship in regards to contracts with . . . dating services" and that Defendant can easily comply with the provisions. He argues that Defendant fails to present arguments that the DSCA has "no practical application" to smartphone applications. Plaintiff further contends that since a majority of dating service contracts are entered into electronically, the DSCA would be

---

[2]Plaintiff does not dispute that Grindr is a smartphone application.

eviscerated if the Court does not apply the DSCA to smartphone applications. Lastly, he argues that Defendant's straw man examples of why the DSCA should not apply to smartphone applications should be disregarded.

Defendant responds that Plaintiff provides no evidence that the Legislature contemplated applying the DSCA to smartphone applications when the statute was enacted in 1989 or that it would have intended the DSCA to reach smartphone applications had it anticipated their invention. The DSCA sought to address high pressure in-person sales, and argues that Plaintiff selectively cites to the legislative history without citing to the entire provision on the purpose of the statute. Moreover, it argues that the legislative history confirms that it was targeting high-pressure in-person sales and high costs, and not a smartphone application with no in-person sales and where costs are not high. In addition, Defendant states that the Legislature considered the business interests of dating service providers with respect to the consumer interests. (Dkt. No. 20-2 at 8, 30) ("Providing a three-day cooling off period will not harm legitimate dating services . . . but will serve to mitigate those occasions in which a consumer is unfairly taken advantage of in a sales presentation.") Defendant argues that its business interests will be harmed if the DSCA applies because during the three day cooling off period, any user could sign up, immediately use the services for three days to make connections, and then demand a refund. According to Defendant, this leads to a risk of abuse that is greater than a brick-and-mortar dating business because a brick-and-mortar dating business takes time to create a consumer's dating profile, set up appointments, identify compatibilities, complete questionnaires and arrange dates.

Section 1694 prescribes certain standards and language that must be included in dating service contracts. Duffens v. Valenti, 161 Cal. App. 4th 434, 445-46 (2008). Under the DSCA,

> a dating service contract is any contract with any organization that offers dating, matrimonial, or social referral services by any of the following means:

>    (a) An exchange of names, telephone numbers, addresses, and statistics.
>    (b) A photograph or video selection process.
>    (c) Personal introductions provided by the organization at its place of business.
>    (d) A social environment provided by the organization intended primarily as an alternative to other singles' bars or club-type environments.

Cal. Civil Code § 1694. The parties do not dispute that Grindr offers dating service contracts as defined under the statute. Moreover,

>    (b) Every dating service contract shall contain on its face, and in close proximity to the space reserved for the signature of the buyer, a conspicuous statement in a size equal to at least 10-point boldface type, as follows:
>
>    "You, the buyer, may cancel this agreement, without any penalty or obligation, at any time prior to midnight of the original contract seller's third business day following the date of this contract, excluding Sundays and holidays. To cancel this agreement, mail or deliver a signed and dated notice, or send a telegram which states that you, the buyer, are canceling this agreement, or words of similar effect. This notice shall be sent to:
>
>    _____
>    (Name of the business that sold you the contract)
>
>    _____
>    (Address of the business that sold you the contract)
>
>    (c) The dating service contract shall contain on the first page, in a type size no smaller than that generally used in the body of the document, the name and address of the dating service operator to which the notice of cancellation is to be mailed; and the date the buyer signed the contract.

Cal. Civ. Code §§ 1694.2(b), (c). "All moneys paid pursuant to any contract for dating services shall be refunded within 10 days of receipt of the notice of cancellation." Id. § 1694.1(e). "If a dating service contract is not in compliance with this chapter, the buyer may, at any time, cancel the contract." Id. § 1694.2(e). "Any contract for dating services which does not comply with this chapter is void and unenforceable." Id. § 1694.4(a).

"The objective of statutory construction is to determine the intent of the enacting body so that the law may receive the interpretation that best effectuates that intent." Fitch v. Select Prods. Co., 36 Cal. 4th 812, 818 (2005) (citing Hassan v. Mercy American River Hosp., 31 Cal. 4th 709, 715 (2003)); In re Corrine W., 45 Cal. 4th 522,

529 (2009). First, the court begins with the plain language of the statute, as the words chosen are the most reliable indicator of legislative intent. In re Corrine W., 45 Cal. 4th at 529. "The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context." Hassan, 31 Cal. 4th at 715; see Halbert's Lumber, Inc. v. Lucky Stores, Inc., 6 Cal. App. 4th 1233, 1238 (1992) ("it is the language of the statute itself that has successfully braved the legislative gauntlet."). "If the plain, commonsense meaning of a statute's words is unambiguous, the plain meaning controls." Fitch v. Select Prods. Co., 36 Cal.4th 812, 818 (2005) (citing In re Jennings, 34 Cal.4th 254, 263 (2004)). However, if the meaning of the words is not clear, then courts may look to the legislative history. Halbert's Lumber, Inc., 6 Cal. App. 4th at 1239.

In Apple Inc., even though the terms of the statute was unambiguous, the court concluded that the plain meaning of the statute was not decisive as to whether the Song-Beverly Credit Card Act of 1971, California Civil Code section 1747.08, and looked at the statutory scheme as a whole to determine whether the statute applied to online transactions, a technology that the Legislature did not envision. Apple Inc. v. Superior Court, 56 Cal. 4th 128, 139 (2013). After an analysis of the legislative history, the California Supreme Court held that section 1747.08 of the California Civil Code "does not govern online purchases of electronically downloadable products because this type of transaction does not fit within the statutory scheme." Id. at 133. The case concerns the requirements under the Song-Beverly Credit Card Act which prohibits retailers from requesting or requiring a cardholder to write any personal identification information on the credit card transaction as a condition to accepting a credit card as payment. Id. at 132. In Apple, the plaintiff alleged that the defendant required him to provide his address and telephone number as a condition of accepting his credit card as payment with regards to a purchase of an electronic download through the Internet. Id. at 133. The Supreme Court of California held that after consideration of "the statute's text, structure and purpose, section 1747.08 does not

apply to online purchases in which the product is downloaded electronically." Id. In Apple, the safeguards against fraud under section 1747.08(d) are not available to the online retailer as an online retailer cannot visually inspect the credit card, the signature on the back of the card or the customer's photo identification. Id. at 140-41. The court explained that the key anti-fraud mechanism in the statutory scheme, section 1747.08(d), had no practical application to online transactions involving electronically downloadable products. Id. at 141. The court concluded that the "statutory scheme, considered as a whole, reveals that the Legislature intended to safeguard consumer privacy while also protecting retailers and consumers against fraud." Id. at 150.

First, the fact that the Legislature did not contemplate smartphone applications when it enacted the DSCA in 1989 does not mean that the statute is not applicable. "Statutory interpretation must be prepared to accommodate technological innovation, if the technology is otherwise consistent with the statutory scheme." Ni v. Slocum, 196 Cal. App. 4th 1636, 1652 (2011). In Apple Inc., the court stated,

> [i]n construing statutes that predate their possible applicability to new technology, courts have not relied on wooden construction of their terms. Fidelity to legislative intent does not 'make it impossible to apply a legal text to technologies that did not exist when the text was created. . . . Drafters of every era know that technological advances will proceed apace and that the rules they create will one day apply to all sorts of circumstances they could not possibly envision.'

Apple Inc., 56 Cal. 4th at 137. Defendant's first argument fails.

Second, Defendant argues, similar to the analysis in Apple, the Legislature considered the business interests when it enacted the DSCA and noted that businesses would not be harmed if the three day rescission provision was a requirement in dating service contracts. However, Defendant asserts that as to smartphone applications, its business interests are affected because users may abuse the three day right to rescind by signing up, using the services, and then canceling after obtaining the benefits of the application. Defendant notes that there is a distinction between an online service which provides immediate connections, and a brick-and-mortar dating business which takes time to create a consumer's dating profile, set up appointments, identify

compatibilities, complete questionnaires and arrange dates.

A review of the legislative history reveals that the Legislature addressed the issue of consumers receiving a full refund even if they received some consideration after the contract was signed. In 1989, when the statute was enacted, the cancellation provision stated "(e) All moneys paid pursuant to any contract for dating services shall be refunded within 10 days of receipt of the notice of cancellation, **except that payment shall be made for any services covered by the contract and received by the buyer prior to cancellation**." Cal. Civil Code § 1694.1 (1989) (emphasis added). Under this section, consumers faced liability for cancelling. (Dkt. No. 20-3 at 8-53.)

In 1993, section 1694.1(e) was amended to allow cancellation of contracts without penalty or obligation and currently states, "(e) All moneys paid pursuant to any contract for dating services shall be refunded within 10 days of receipt of the notice of cancellation." Cal. Civ. Code § 1694.1(e).

The Attorney General, a sponsor of the bill, sought to close a loophole in the law which allows consumers to be "penalized" if they legally cancel the contract. (Dkt. No. 20-3 at 26.) For example, at the time of signing a dating service contract, the consumer pays a $150 fee. At the signing, the consumer also poses for a video to be entered into the dating library and the consumer receives a copy. However if the consumer timely cancels, the dating service only refunds $50 of the $150 claiming that the video cost $100. (Id. at 26-27; see also 31, 33.) The Legislature sought to eliminate the penalty for a consumer's right to cancel and to provide meaningful protection to consumers and not a trap. (Id. at 33-34 (citing other cooling off statutes where a consumer can cancel without any liability).) In opposing the amendment, a dating service provider argued that it "would be exceedingly inequitable for consumers to get all the benefits under a contract and upon cancellation, to also receive a return of all consideration paid. No business or industry could withstand such a situation." (Dkt. No. 20-3 at 20.) The amendment passed allowing a consumer to timely cancel and to receive a full refund. Therefore, the amendment put responsibility of any costs incurred during the cooling

off period to fall on the business, and not the consumer.

Therefore, Defendant's argument that the three day cancellation provision could lead to abuse where customers would take the benefit of the service during the three day cooling off period to make connections and then cancel without penalty, was contemplated by the Legislature when it amended section 1694.1(e) in 1993.

The general purpose of enacting section 1694 "is to protect the public against perceived fraud, deceit and financial hardship in regard to contracts for services with dating services . . . ." (Dkt. No. 20, D's RJN, Ex. A at 24.) Specifically, at the time, the Legislature was concerned about high-pressure sales tactics from employees of dating services that were very expensive. (Id.) Although the concerns regarding high pressure sales tactics from employees are not applicable to Grindr, consumer protection laws to prevent fraud in dating services contract can have practical application to online transactions or can fit within the statutory scheme. See Apple, 56 Cal. 4th at 133, 141 ("this type of transaction does not fit within the statutory scheme", and "has no application to online transactions involving electronically downloadable products"). In fact, New York[3] has enacted a consumer protection statute that governs the contents of an Internet dating service contract and requires a three day right to cancel provision. N.Y. Gen. Bus. Law §§ 394-c(1)(a); c(7)(a); c(7)(b) (requiring three day right to cancel for internet dating service contracts including font requirements). Furthermore, California courts have applied the DSCA to internet dating sites. See Adelman v. Spark Networks Ltd., Nos. B195332, B197097, 2008 WL 2108667 (Cal. Ct. App. May 20, 2008) (unpublished) (addressing actual injury or damages in a purported class

---

[3]New York and California have similar aggressive unfair competition statutes. Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc., 178 F. Supp. 2d 198, 232 (E.D.N.Y. 2001), reversed on other grounds by Empire Healthchoice, Inc. v. Philip Morris USA, Inc., 393 F.3d 312 (2d Cir. 2003) (describing New York, Texas, and California as most active in enforcing consumer protection laws); see e.g. Guido v. L'Oreal, USA, Inc., No. CV 11-1067 CAS(JCx), 11-5465CAS (Jcx), 2013 WL 3353857, at *12 (C.D. Cal. July 1, 2013) (comparing and commenting on similarity between California's consumer fraud statutes under the UCL, CLRA and FAL with New York's Gen Bus. Law § 349 for deceptive business practices and § 350 for false advertising).

1  action that dating service contracts of internet dating site failed to comply with section
2  1694); Graf v. Match.com LLC, CV 15-3911 PA (MRWx), 2015 WL 4263957, at *1
3  (C.D. Cal. July 10, 2015) (addressing motion to compel arbitration based on terms of
4  use with internet dating company for violating 1694.2 for failing to provide three day
5  notice of cancellation); Evans v. IAC/Interactive Corp., 244 F.R.D. 568 (C.D. Cal.
6  2007) (motion for class certification alleging numerous causes of action including
7  violation of section 1694 against Match.com, an online dating service.) Accordingly,
8  the Court DENIES Defendant's motion to dismiss on this ground.

**E.     California Business & Profession Code section 17200 *et seq*. and section 17535 *et seq*.**

The FAC alleges violations of California Business & Professions Code sections 17200 *et seq.* and sections 17535 *et seq.* (Dkt. No. 15, FAC ¶¶ 32-52.) As to section 17535, the FAC states, "17535 *et seq*. (the 'UCL') allows 'any person who has suffered injury in fact and has lost money or property' to prosecute a civil action for violation of the UCL. Such a person may bring such an action on behalf of himself and others similarly situated who are affected by the unlawful, unfair, or fraudulent business practice." (Dkt. No. 15, FAC ¶ 47.)

First, Defendant asserts that Plaintiff has not alleged standing to sue for UCL violations because he has not pled that he lost money as a result of the allegedly wrongful conduct. Second, Defendant argues that the UCL claim should be dismissed because the UCL is derivative of the section 1694 claim, which it claims is without merit. Furthermore, Defendant contends that Plaintiff fails to plead actual reliance based on an alleged omission by Grindr. As to the section 17535 claim, Defendant argues that this claim is unintelligible as section 17535 concerns the False Advertising Law, ("FAL"), and not any relief sought under the UCL. However, the section 17535 claim references the UCL. Therefore, Defendant states that it appears the Plaintiff is seeking relief under section 17204. However, under either FAL or section 17204, Plaintiff's FAC does not plead sufficient facts to support the standing requirements

under the UCL or the FAL.

Plaintiff fails to oppose and address Defendant's argument on the UCL and FAL claims. Based on Plaintiff's failure to oppose, the Court GRANTS Defendant's motion to dismiss UCL and section 17535 claim.

**F.   Article III Standing**

Defendant moves under Rule 12(b)(1) arguing that Plaintiff lacks Article III standing for failing to allege a personal injury. See Maya, 658 F.3d at 1067 ("Though lack of statutory standing requires dismissal for failure to state a claim, lack of Article III standing requires dismissal for lack of subject matter jurisdiction"). The question of standing is distinct from the merits of Plaintiff's claim. Id. at 1068. Plaintiff does not address this argument and appears to concede it. However, since the Court GRANTS Defendant's motion to dismiss based on statutory standing, the Court need not address Article III standing. See Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 97 n. 2 (1998) (approving of resolving statutory standing before Article III standing); id. at 115–17 (Stevens, J., concurring) (citing cases resolving other standing issues before Article III standing); Ortiz v. Fibreboard Corp., 527 U.S. 815, 831 (1999); ORNC Action v. BLM, 150 F.3d 1132, 1140 (9th Cir. 1998) (citing Steel for proposition that decision on statutory standing may take priority over Article III standing); Baylock v. First American Title Ins. Co., No. C06-1667RAJ, 2008 WL 8741396, at *5 (W.D. Wash. Nov. 7, 2008) ("The court may properly resolve that statutory standing question without determining Plaintiffs' Article III standing.")[4]

**G.   Judicial Notice**

Defendant filed a request for judicial notice of the legislative history of California's Dating Service Contracts Act, Civil Code §§ 1694-1694.4. (Dkt. No. 20.) Plaintiff argues that considering the legislative history, which constitutes extrinsic evidence, on a motion to dismiss in not appropriate. (Dkt. No. 23.)

---

[4] In the alternative to dismissal, Defendant argues that the Court should strike the purported class claims. (Dkt. No. 19-1, D's Mot. at 29.) Since the Court dismisses the FAC, the Court need not address this argument.

Federal Rule of Evidence 201(b) permits judicial notice of a fact when it is "not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Legislative history reports and documents reflecting the legislative history of an enactment are proper subjects of judicial notice. See Anderson v. Holder, 673 F.3d 1089, 1094 n. 1 (9th Cir. 2012); Palmer v. Stassinos, 348 F. Supp. 2d 1070, 1077 (N.D. Cal. 2004) ("The court finds that all documents for which defendants seek judicial notice constitute judicial facts sufficiently capable of accurate and ready determination and therefore takes judicial notice of defendants' submitted legislative history").

The Court concludes that judicial notice of the legislative history of the DSCA is appropriate, and GRANTS Defendant's request for judicial notice.

**H.    Leave to Amend**

In his opposition, Plaintiff seeks leave to amend if the Court dismisses any of his claims. Leave to amend, whether or not requested by the plaintiff, should be granted unless amendment would be futile. Schreiber Distrib. Co., 806 F.2d at 1401. Here, an amendment to the complaint would not be futile, and the Court grants Plaintiff leave to file a second amended complaint.

## Conclusion

Based on the above, the Court GRANTS Defendant's motion to dismiss with leave to amend. Plaintiff shall file a second amended complaint on or before **December 31, 2015.**

IT IS SO ORDERED.

DATED:  December 15, 2015

HON. GONZALO P. CURIEL
United States District Judge